UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TAMELA ROADES,                    )
                                  )
            Plaintiff,            )
                                  )
      v.                          )          No.  4:10CV1892 TIA
                                  )
MICHAEL J. ASTRUE, COMMISSIONER   )
OF SOCIAL SECURITY,               )
                                  )
            Defendant.            )

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review

of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social

Security Act and for Supplemental Security Income benefits under Title XVI of the Act.  The parties

consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On February 9, 2009[1], Plaintiff filed applications for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").  (Tr. 77-87)  Plaintiff alleged disability beginning July 7, 2007

due to Type I Diabetes, Ketoacidosis, Neuropaty, Hep. C Tumors, Hashimotos Disease, Rheumatoid

Arthritis, Tachycardia, Retinopathy, Fibroid Tumors, Alopecia Areata, and High Cholesterol.  (Tr.

38, 77)  Plaintiff's applications were denied on March 6, 2009, after which Plaintiff requested a

hearing before an Administrative Law Judge (ALJ).  (Tr. 35-42, 45)  On March 15, 2010, Plaintiff

appeared and testified at a hearing before an ALJ.  (Tr. 21-34)  In a decision dated June 8, 2010, the

ALJ determined that Plaintiff had not been under a disability from July 7, 2007 through the date of

_____

[1]  The record shows that Plaintiff protectively filed these applications on January 12, 2009.

the decision. (Tr. 6-17) The Appeals Council denied Plaintiff's Request for Review on September 8, 2010. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel. Upon examination by the ALJ, Plaintiff testified that she in a home in St. Ann, Missouri with her husband and daughter. She had a GED, and she completed cosmetology school as well. However, Plaintiff had not been licensed in cosmetology since 1986. She last received unemployment benefits in 2004 or 2005, after working for Keystone Automotive Group. (Tr. 24-25)

When the ALJ noted medical records indicating that Plaintiff was working in 2008, Plaintiff testified that her last date of employment was July 7, 2007. Plaintiff worked for Fenders and More beginning in 1998. The company was later purchased by Keystone Automotive. The ALJ then instructed Plaintiff's attorney to clarify hospital records indicating that Plaintiff worked for Fenders and More as of October 2008. (Tr. 25-26)

The Plaintiff further testified that she received worker's compensation sometime around 1988 for a short period of time. Plaintiff never attended vocational rehabilitation. She had not been in jail, nor had she ever been charged with a DUI or hospitalized for alcohol or drug abuse. (Tr. 26-27)

With regard to Plaintiff's physical impairments that allegedly prevent her from working, Plaintiff's attorney listed those impairments as insulin-dependent diabetes mellitus, rheumatoid arthritis, and peripheral neuropathy. Plaintiff stated that she was diagnosed with diabetes in January 2007 and rheumatoid arthritis in May 2008. She had been diagnosed with, but not treated for, hepatitis C. (Tr. 27-28)

Upon questioning by her attorney, plaintiff testified that she was able to drive a car but had difficulty doing so. She stated that some days would be unsafe for her to drive because she could not turn her neck from right to left due to rheumatoid arthritis. In addition, she had trouble getting in the car because she was wobbly and had difficulty opening the handles. Plaintiff testified that she experienced 20 bad days in a typical month, which were days she could not close her hands to grab a pan or turn a door knob. She also experienced shaky knees and had trouble getting up and down. (Tr. 28-29)

The ALJ then continued to query the Plaintiff. She still smoked cigarettes but only smoked about 4 cigarettes a day with the aid of the patch. However, at the end of 2008, Plaintiff continued to smoke a pack of day. Further, Plaintiff stated that although she was unable to turn a door knob, Plaintiff could still light a cigarette. (Tr. 29-30)

Plaintiff also testified that she had always been compliant with her medications. However, the ALJ pointed out medical records indicating that Plaintiff was hospitalized because she was noncompliant with her insulin. Plaintiff stated that she did not have a doctor treating her with insulin at that time. (Tr. 30)

Upon further questioning by her attorney, Plaintiff stated that she was referring to moving from sitting to standing positions when she stated she could not get up and down. Her knees were equally wobbly, which she attributed to lack of muscle. In addition, Plaintiff stated that she vomited from methotrexate, which she took for rheumatoid arthritis. She took the medication once a week but could not keep anything in her stomach for 3 mornings during that week. Other side effects included feeling "drugged" from Vicodin, her pain medication. (Tr. 30-32)

In a post-hearing addendum, the ALJ noted that Plaintiff was very inconsistent with her

answers during the hearing. In addition, medical notes showed a questionable diagnosis of rheumatoid arthritis because she did not have the physical signs. Further, the record was unclear as to when Plaintiff stopped working. (Tr. 32-33)

Plaintiff completed a Function Report – Adult on February 21, 2009. She stated that from the time she woke up until going to bed, she took her medication then fixed something to eat about 2 to 3 hours later. On days when it was painful and difficult to walk or use her hands or arms, Plaintiff would merely get dressed. On good days, she picked up around the house. She could perform activities for about 4 hours before she was exhausted. She ate lunch and took several naps. Her husband made dinner. Plaintiff ate with her family, watched television, and went to bed. She woke up about 10 times a night to go to the bathroom. Plaintiff took care of her dog and cat with help from her husband and daughter. Before her condition, Plaintiff could cook, clean, do yard work, shop, and volunteer. She had strength and never had to worry about good and bad days. Aside from no longer being able to perform these activities, her condition caused sleep problems because she constantly had to use the bathroom, and she was unable to find a comfortable position due to pain. With regard to personal care, Plaintiff had problems with zippers, buttons, and bra clasps. She could not sit in the tub because she had trouble pulling herself out. In addition, she had trouble getting out her medications and using insulin syringes. (Tr. 117-18)

Further, Plaintiff reported that she needed reminders to take care of her personal needs and grooming. Specifically, she kept a calendar to remind her to take her medications. She was able to prepare meals. On good days, she could make bacon and eggs, along with other meals. However, her family helped her lift pans. Normally, she fixed leftovers. Plaintiff prepared meals about once or twice a week. She started cooking early because she took 3 to 4 hours to prepare a meal. Before

4

her condition, she cooked large suppers daily.  (Tr. 119)

With regard to household chores, Plaintiff could do laundry, sweep the kitchen, dust, and load and unload the dishwasher on good days only.  She needed to rest while performing these chores. She had to force herself to do these things because her mind was willing, but her body was not. Plaintiff went outside every other day.  She had problems getting along with others because she was short-tempered when she did not feel well.  Plaintiff further reported that her conditions affect lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, memory, completing tasks, using hands, and getting along with others.  She explained that her feet, knees, shoulders, elbows, wrists, hands, neck, lower back and jaws hurt.  In addition, her arms and legs were weak and gave out completely.  She believed she could walk 20 feet, and she had no problems paying attention or following written instructions.  However, Plaintiff had trouble remembering spoken instructions and needed to write down the instructions.  She could get along with people and handled stress well.  Plaintiff feared being put in a nursing home because she was getting worse every day and could no longer take care of herself.  (Tr. 119-22)

### III.  Medical Evidence

On January 2, 2007, Plaintiff was treated at the Diabetes & Endocrinology Specialists, Inc. Treatment notes indicate a previous diagnosis of type II diabetes mellitus in 2006.  The examining physician assessed diabetes mellitus, probably type I; Hashimoto's thyroiditis[2]; autoimmune alopecia[3];

---

[2] Hashimoto thyroiditis is the "diffuse infiltration of the thyroid gland with lymphocytes, resulting in diffuse goiter, progressive destruction of the parenchyma and hypothyroidism." Stedman's Medical Dictionary 1198 (28th ed. 2006).

[3] alopecia is defined as "[a]bsence or loss of hair."  Stedman's Medical Dictionary 54 (28th ed. 2006).

and a history of anemia that required iron and a blood transfusion.  (Tr. 208-10) Blood testing performed that same date revealed high glucose levels, high cholesterol, and high hemoglogin A1C. (Tr. 219-21) A nerve conduction test performed for evaluation of diabetic peripheral neuropathy showed abnormal lower extremity motor findings on the right.  (Tr. 227-30)

On January 31, 2007, handwritten medical notes indicate that Plaintiff stopped taking insulin two weeks prior.  Her blood sugar was down to 200.  According to Plaintiff, she had blisters at dissection sites, nausea, and vomiting.  Everything improved when she stopped insulin.  (Tr. 246)

Plaintiff was admitted to St. Luke's Hospital on March 8, 2007 and discharged on March 13, 2007.  According to the Discharge Summary, Plaintiff was diagnosed with diabetes mellitus in August, 2006.  She had not been complaint with her insulin regimen.  Diagnoses included diabetic ketoacidosis, resolved; diabetes mellitus type 2; hypothyroidism; uterine fibroids; back pain, probable muscle strain, well-controlled with Valium.  (Tr. 285) On March 9, 2007, Plaintiff underwent a consultative examination for abdominal pain.  Dr. Ahmad A. Karadaghy assessed longstanding hepatitis C infection, with no sign of active hepatitis; sacral pain in the posterior part of the back, etiology unclear; discomfort and swelling below the left subcostal margin, possibly related to abnormality within the liver such as fatty infiltration; uncontrolled diabetes with diabetic ketoacidosis; and recent bronchitis.  Dr. Karadaghy recommended comprehensive blood testing to categorize her liver disease, ultrasound of the abdomen, and clinical follow-up.  (Tr. 289-91) Lumbar Spine x-rays were negative.  (Tr. 304)

Plaintiff returned to the Diabetes & Endocrinology Specialists, Inc. on July 10, 2007. Plaintiff's blood sugars were very high.  In addition, she had lost weight and complained of burning feet and muscle cramps.  The examining physician assessed diabetes mellitus, Hashimoto's, and a

history of anemia.  (Tr. 206-07)

Plaintiff was hospitalized on that same date at St. Luke's Hospital.  She was discharged on July 13, 2007 with diagnoses of uncontrolled diabetes mellitus; polyneuropathy sensory/motor secondary to poorly controlled diabetes; hyperlipidemia; hyperthyroidism; and chronic anemia.  The Discharge Summary noted that upon admission, Plaintiff's blood sugar was elevated, and she complained of numbness and tingling in her bilateral lower extremities.  A nerve conduction study demonstrated moderate to severe sensory motor demyelinating and axonal polyneuropathy with mononeuritis multiplex pattern, probably secondary to poorly controlled diabetes mellitus.  Her discharge medications included Lantus, Apidra, Synthroid, Neurontin, Zocor, and Abreva.  Plaintiff was to follow up with her physician, Dr. Ralph Oiknine.  (Tr. 320-21)

During a follow-up visit on August 21, 2007, Plaintiff asked whether she could be off insulin.  Her vision was improved, but she reported weakness.  The attending physician assessed diabetes mellitus, Hashimoto's, and history of anemia.  (Tr. 204-05) Fasting glucose levels from lab studies were 512, which were panic high.  (Tr. 244) Plaintiff's Thyroid Level was good.  (Tr. 211)

On August 31, 2007, Plaintiff was admitted to the hospital for diabetes management after complaining of dizziness and feeling lightheaded.  Her blood sugars were running high, and she had lost quite a bit of weight.  In addition, Plaintiff was fatigued, unsteady on her feet, tachycardiac, and orthostatic.  She was discharged on September 1, 2007 with diagnoses of diabetic ketoacidosis; dehydration and orthostatic hypotension secondary to dehydration; weight loss, with CT of the abdomen and chest negative; uterine fibroids; weight loss presumably secondary to uncontrolled diabetes; history of abdominal pain while on insulin, no obvious cause identified; alopecia areata; history of menorrhagia; fibroid uterus; history of candida esophagitis status post upper gastrointestinal

endoscopy; history of poor intravenous access status post port-a-cath insertion; status post ovarian cyst removal; status post appendectomy; gastroesophageal reflux disease; Hashimoto's disease; hypothyroidism; and history of hepatitis C being positive contracted from her husband. (Tr. 338-41)

On September 14, 2007, Dr. Augustine completed a Statement for Disabled License Plates/Placard, stating that Plaintiff could not ambulate or walk 50 feet without stopping to rest due to severe and disabling arthritic, neurological, orthopedic condition, or other severe and disabling condition. The doctor stated Plaintiff had a temporary disability lasting 151 to 180 days. (Tr. 354)

Treatment notes from an appointment on July 17, 2008 revealed that Plaintiff was very poor and noncompliant. Plaintiff complained of foot pain and wanted narcotics. However, her blood sugar was over 600, and Dr. L. Joseph Kennington refused narcotics medication, noting a past history of drug addiction. Dr. Kennington urged Plaintiff to go to the ER, but she refused. He diagnosed diabetes, possible thyroid disease, and possible peripheral neuropathy. (Tr. 495)

Plaintiff presented to the ER at St. Luke's Hospital on August 11, 2008 and was described as grossly noncompliant with her therapy. Plaintiff complained of weakness, and her blood sugar was over 800. Plaintiff stated that she entered the hospital only for treatment of arthritis. She exhibited unusual behavior by disconnecting IV fluids and leaving the area to smoke. Plaintiff requested Percocet, which she said improved her severe arthritis. Plaintiff was hospitalized over night and indicated that she felt better the next day. Plaintiff was discharged with diagnoses including diabetes mellitus, grossly noncompliant; hyperosmolar state, resolved; unknown autoimmune disease; alopecia areata; status post port-a-cath in the left side of the chest; baldness; history of anemia status post multiple transfusions; history of candidal esophagitis; history of hepatitis C contracted from her husband; Hashimoto thyroiditis, currently hypothyroid; and gastroesophageal reflux disease.

Plaintiff's discharge medications included Lantus, Metoprolol, Synthroid, and Apidra. Dr. Talat M. Nawas doubted that Plaintiff would be compliant in any way. (Tr. 420-21)

Plaintiff also complained of joint pains and generalized aphasia and weakness. Plaintiff indicated that she no longer saw a specialist because she did not have insurance. The joint pain involved morning stiffness and pain in her hands, knees, and feet which was migratory in nature. In addition, she experienced burning and occasional swelling and warmth in joints. The pain was sometimes 9/10 but was 4-5/10 during the examination. Plaintiff appeared frustrated by her condition and requested pain medication. Dr. Choudhary prescribed Percocet and advised further work up regarding ANA panel and rheumatoid factor, but decided to delay the tests because Plaintiff had no insurance. Dr. Ghazal also evaluated Plaintiff for uncontrolled diabetes. Dr. Ghazal noted the Plaintiff had possible type 1 diabetes that required a lot of insulin and was somewhat insulin resistant. Dr. Ghazal recommended adjusting Plaintiff's insulin. (Tr. 422-28)

On September 4, 2008, Plaintiff presented to the West County Family Practice and was diagnosed with diabetes mellitus, poorly controlled. The examining physician noted that Plaintiff had started humalog, which was from a friend. The doctor prescribed Vicodin for pain, Ibuprofen, and Lopressor for diabetes. In addition, Plaintiff received a referral to immunology for unspecified hypothyroidism. The physician also discussed low cholesterol diet, weight control, daily exercise, and home glucose monitoring. (Tr. 461-64)

Plaintiff underwent a whole body bone scan on September 16, 2008 after Plaintiff presented with multiple joint pain. The test revealed mild to moderate uptake in the right fifth metatarsal head and talonavicular regions likely degenerative in nature. Otherwise, the scan was negative. An addendum indicated that delayed images on the hands were done, revealing moderate increased

uptake in the right hand IP joint of the thumb and MCP joints of the first and second digit. In addition, the scan showed mild to moderate uptake throughout the wrist. Dr. Elizabeth G. McFarland noted that a hand series could be done to evaluate for inflammatory arthritis. (Tr. 419)

On October 3, 2008, Plaintiff presented to the ER at DePaul Health Center with complaints of chest pain. Plaintiff was in severe diabetic ketoacidosis and had hyperglycemia with severe acidosis. She was transferred to the intensive care unit and received aggressive hydration and an insulin drip. (Tr. 367) Plaintiff went to the ER at St. Luke's Hospital the following day, after leaving DePaul Health Center against medical advice. Plaintiff was discharged on October 7, 2008, with instructions to follow up with her primary care physician immediately. In addition, Dr. Alifiya Fakhri advised Plaintiff to be compliant with her medications. In the discharge summary, Dr. Fakhri noted that Dr. Linda Hunt, a rheumatologist, examined Plaintiff and noted that Plaintiff did not have the typical signs of swelling expected with rheumatoid arthritis. Dr. Hunt recommended pain management. Discharge diagnoses included diabetic ketoacidosis; type 1 diabetes mellitus, uncontrolled; noncompliant with diabetic medications; polyarthralgia, probably secondary to hepatitis C; hypokalemia; hypomagnesia; hypophosphatemia; hypertension; hypothyroidism; and a history of hepatitis C. (Tr. 398-406)

On October 27, 2008, Plaintiff saw Dr. Kennington at West County Family Practice for complaints of joint pain. Plaintiff reported having seen a rheumatologist, who diagnosed rheumatoid arthritis. Dr. Kennington noted that he would refer Plaintiff to pain management and endocrinology because he was not qualified to treat Plaintiff's complicated endocrine and autoimmune issues. He would refill her Vicodin only once until she went to pain management. On examination, Plaintiff appeared healthy in no acute distress. Dr. Kennington assessed diabetes with poor control and poor

patient complaince; weight loss secondary to diabetes; and auto immune disease and chorionic pain syndrome as noted. He prescribed hydrocodone, potassium, insulin, and magnesium. He also referred Plaintiff to a pain clinic and to endocrinology. (Tr. 465-72)

Plaintiff returned to West County Family Practice on November 26, 2008, complaining of symptoms of an upper respiratory infection. She was diagnosed with bronchitis and prescribed antibiotics. The treatment records also indicate that Plaintiff reported seeing Dr. James Williams for pain management. Plaintiff stated that Dr. Williams scared her and that she did not need treatment, as her pain was getting better on its own. (Tr. 473-78)

On January 20, 2009, Plaintiff complained that her whole body was swelling. Plaintiff's examination was normal. She appeared frail but had no edema. Dr. Kennington diagnosed diabetes mellitus, poorly controlled and with poor compliance; history of hepatitis C; chronic pain, has abused drugs in the past; unspecified hypothyroidism; and unspecified essential hypertension. (Tr. 479-87)

Plaintiff was seen at the Center for Pain Management on February 2, 2009. Plaintiff reported that her pain began in May of 2008, and she rated the pain as an 8 out of 10. Medication and lying down alleviated the pain. In addition, Plaintiff indicated that almost every activity aggravated her pain. Plaintiff smoked one pack of cigarettes a day. The physician assessed rheumatoid arthritis and diabetes and prescribed Prednisone and Oxycodone. Plaintiff was instructed to follow up in 3 weeks. (Tr. 449-53) When Plaintiff returned on February 23, 2009, the examination was normal. Plaintiff was prescribed Methotrexate and Prednisone. (Tr. 747-48)

On March 18, 2009, Plaintiff complained of joint pain and swelling. The musculoskeletal exam revealed some inflammation in the digits and nails. (Tr. 743-44) Plaintiff's pain was less severe on April 13, 2009. Dr. Holloway continued Prednisone and also prescribed Enbrel. (Tr. 739-42)

On May 8, 2009, Plaintiff was again assessed with rheumatoid arthritis. Plaintiff was also prescribed Xanax for anxiety and adjustment disorder. Treatment notes on July 2, 2009 indicate that Plaintiff could call with rheumatoid flare ups for a Prednisone prescription. Plaintiff continued taking Xanax, Oxycodone, and Methotrexate. Dr. Holloway planned to send a letter encouraging the foundation to certify Plaintiff's continued Enbrel use. (Tr. 731-32) Dr. Holloway authored a letter on July 6, 2009, indicating that Plaintiff was under the care of the Center for Interventional Pain Management and was taking Enbrel every week. (Tr. 706)

Plaintiff received a right trigger point injection on September 8, 2009. Dr. Holloway assessed rheumatoid arthritis and other inflammatory polyar and recommended that Plaintiff continue taking Enbrel. She also had unspecified back ache, which benefitted from corticosteroid injection. Plaintiff also complained of abdominal pain at an unspecified site. Dr. Holloway also prescribed Percocet. (Tr. 727-29)

Plaintiff was admitted to DePaul Health Center on October 20, 2009 due to aggravated rheumatoid arthritis, with increasing pain in the mid-back area. Upon discharge on October 23, 2009, Plaintiff was diagnosed with exacerbation of rheumatoid arthritis; severe hyperglycemia, uncontrolled; insulin-dependent diabetes mellitus, improved; history of hepatitis C; mitral valve prolapse; peripheral neuropathy; hypothyroidism; and history of chronic anemia. Plaintiff's discharge medications included Mobic, Humalog, Prednisone, calcium with vitamin D, Pepcid, and Percocet. (Tr. 522-44)

Plaintiff returned to DePaul Health Center on October 27, 2009, complaining of right upper quadrant abdominal pain, nausea, and vomiting. Plaintiff underwent laproscopic cholecystectomy to

remove her gallbladder. Plaintiff was discharged on November 1, 2008[4] with diagnoses of cholithiasis with cholecystitis s/p cholecystectomy; weight loss with steatorrhea; dehydration; diabetes with keoacidosis; rheumatoid arthritis; and peripheral neuropathy. Her prescriptions included ferrous sulfate, Percocet, Humalog, Prednisone, Os-Cal, Pepcid, Reglan, Toprol, Phenergan, Rheumatrex, Synthroid, Enbrel, and Xanax. (Tr. 540-42, 545-607)

Plaintiff was again admitted to the hospital on November 11, 2009 and released on November 17, 2009. Plaintiff complained of right flank pain and indicated that her pain was worse since doctors removed her gallbladder. Discharge diagnoses included nausea, vomiting, abdominal pain, status post laproscopic cholecystectomy of unclear etiology; diabetes mellitus, type 2, uncontrolled; hypothyroidism; arthritis; hypertension; hepatitis C; anxiety; tobacco use; and vaginal spotting. Dr. Anwer Z. Rahman noted that a positive ultrasound showed fibroids. Dr. Rahman added Colace to Plaintiff's list of prescription medications. (Tr. 609-57)

Plaintiff returned to Dr. Holloway on January 20, 2010 to follow up with her pain. Dr. Holloway diagnosed rheumatoid arthritis and other inflammatory polyar, for which he prescribed Prednisone taper and waited for Enbrel from the pharmacy. He also assessed backache unspecified and benign essential hypertension. He prescribed Xanax and Dilaudid for pain. (Tr. 714-15) On February 4, 2010, Dr. Holloway noted that Plaintiff had been admitted to DePaul Hospital from February 2, 2010 to February 3, 2010 with Keloacidosis and a bladder infection. He assessed diabetes with ketoacidosis type 1 uncontrolled and benign essential hypertension. (Tr. 712-13)

### IV. The ALJ's Determination

---

[4] While the vast majority of records from this hospital visit indicate a discharge date of November 1, 2009, the Physician Discharge Summary indicates a discharge date of November 5, 2009. (Tr. 540-42)

In a decision dated June 8, 2010, the ALJ found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2012. Plaintiff had not engaged in substantial gainful activity since July 7, 2007, her alleged onset date of disability. Further, the ALJ determined that Plaintiff's severe impairment was diabetes mellitus with poor compliance with prescribed treatment. The ALJ also acknowledged Plaintiff's medical history of other disorders including rheumatoid arthritis, alopecia, and an unspecified autoimmune disorder. However, the ALJ also noted that some physicians deemed the diagnoses "questionable," and the ALJ determined that they had only a de minimis effect on Plaintiff's ability to perform substantial gainful activity. As such the ALJ found these disorders to be non-severe. (Tr. 11-12)

In addition, the ALJ noted Plaintiff's other alleged impairments of gastro-esophageal reflux disorder; a candida esophagitis infection; hypothyroidism; Hashimoto's disorder; history of hepatitis C; uterine fibroids; high cholesterol; infected teeth; and drug addiction. The ALJ determined that these impairments had no more than a de minimis effect on Plaintiff's ability to work because they were either controllable with medication or did not require ongoing treatment. Thus, the ALJ found these alleged impairments to be non-severe. With regard to Plaintiff's drug addiction, the ALJ assessed her drug-seeking behavior in light of the functional criteria set forth in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments, 20 C.F.R., Part 404, Subpart P, Appendix 1. Known as the "paragraph B" criteria, the ALJ determined that Plaintiff's prescription drug addiction did not limit her activities of daily living; social functioning; or concentration, persistence or pace. In addition, Plaintiff experienced no episodes of decompensation in the work place, and she had never been treated for a mental disorder. Thus, Plaintiff did not meet a listed mental impairment. (Tr. 12-13)

14

The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Appendix 1, Subpart P.  The ALJ reasoned that the Listing required the condition to be disabling despite compliance with prescribed treatment and that, despite several hospitalizations, Plaintiff had been grossly noncompliant with diet, medication, and physician visits.  Further, Plaintiff did not contend that her impairment met or equaled any Listing.  (Tr. 14)

After carefully considering the entire record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform the full range of light work as defined in the regulations.  In support of this RFC finding, the ALJ assessed Plaintiff's testimony during the hearing and determined that Plaintiff's statements regarding the intensity, persistence, and limiting effects of the her symptoms were not credible to the extent they were inconsistent with the RFC finding.  Specifically, the ALJ noted that Plaintiff was not compliant with prescribed diet and medication, contrary to her testimony that she was always compliant.  Further, although Plaintiff denied a history of drug addiction, the record demonstrated such history, which was the basis for denial of her pain medication requests.  In addition, Plaintiff stated she could not turn a door knob or afford medical treatment, yet she continued to pay for and smoke 20 cigarettes a day.  Plaintiff also had not applied for Medicaid or sought free or low cost medical care.  (Tr. 14-15)

The ALJ also assessed the medical records from Dr. Holloway, which indicated significant improvement of Plaintiff's pain with treatment.  Further, the clinical and objective medical evidence was inconsistent with allegations of total debilitation.  The ALJ noted the lack of evidence showing significant muscle atrophy, paravertebral muscle spasm, sensory motor loss, reflex abnormality, gait disturbance, or reduced range of motion.  Plaintiff was also untruthful with her physicians such that

the ALJ found her testimony unreliable unless independently corroborated. The ALJ further stated that Plaintiff had not produced requested evidence demonstrating that she was not employed by Fenders and More, as she reported to the hospital, while she was allegedly disabled. In sum, the ALJ concluded that the RFC finding was supported by the objective medical evidence, evidence of work activity, and noncompliance with prescribed treatment. To the extent that one physician indicated Plaintiff could not walk more than 50 feet due to her condition, that physician provided no explanation for this limitation. (Tr. 15-16)

The ALJ next determined that Plaintiff was unable to perform any past relevant work. Given her age of 43 years on the alleged onset date, which was defined as a younger individual, along with her education, work experience, and RFC, the ALJ relied upon the Medical-Vocation Guidelines (Grids) to determine that a significant number of jobs existed in the national economy which Plaintiff could perform. Thus, the ALJ concluded that Plaintiff had not been under a disability, as defined by the Social Security Act, from July 7, 2007 through the date of the decision. (Tr. 16-17)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination

of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work.  Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'"  Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the

evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[5] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## VI. Discussion

In her Brief in Support of the Complaint, the Plaintiff asserts two arguments. First, Plaintiff asserts that the ALJ failed to properly consider all of the medically determinable impairments and failed to properly consider the medical evidence of the record; thus, the ALJ failed to properly consider Plaintiff's RFC. Second, the Plaintiff argues that the ALJ's decision was not supported by substantial evidence because it lacked vocational expert testimony despite significant nonexertional impairments, including pain. Defendant, on the other hand, maintains that the ALJ properly evaluated

---

[5]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

Plaintiff's RFC, including the severity of Plaintiff's impairments, Plaintiff's credibility, and the medical opinions in the record. In addition, the Defendant asserts that ALJ properly relied on the Grids to determine that Plaintiff could perform other jobs existing in significant numbers in the economy.

The undersigned finds that the ALJ erred in his RFC assessment and that the case should be remanded for further review. Residual Functional Capacity (RFC) is a medical question, and the ALJ's assessment must be supported by substantial evidence. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1). " Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996) (emphasis present). The ALJ has the responsibility of determining a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). This evidence includes descriptions and observations of the claimant's limitations from the alleged impairment(s) and symptoms provided by the claimant and by family, neighbors, friends, or other persons. 20 C.F.R. § 416.945(a)(3). "An 'RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" Sieveking v. Astrue, No. 4:07 CV 986 DDN, 2008 WL 4151674, at *9 (E.D. Mo. Sept. 2, 2008).

The Plaintiff argues that the ALJ failed to cite any medical evidence in support of the RFC finding. The undersigned agrees. Although the ALJ did assess the medical evidence, the ALJ jumped to the conclusion that the Plaintiff was capable of performing the full range of light work. However, the ALJ failed to include a properly supported discussion demonstrating that Plaintiff had the ability to work in an ordinary work setting on a regular and continuing basis, despite her limitations. (Tr. 14-16)

More importantly, the ALJ did not provide an explanation regarding which medical evidence supported the RFC determination. Indeed, the ALJ's determination is void of any evidence supporting the requirements of light work. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Here, none of the physicians assessed Plaintiff's physical ability to walk, stand, sit, lift, carry, or perform other work-related activities during a normal workday. The ALJ has the duty to fully and fairly develop the record. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). "If the ALJ did not believe . . . that the professional opinions available to him were sufficient to allow him to form an opinion, he should have further developed the record to determine, based on substantial evidence, the degree to which [Plaintiff's] . . . impairments limited her ability to engage in work-related activities." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (citation omitted). As stated previously, RFC is a medical question. Nothing in the medical evidence supports the ALJ's determination that Plaintiff could perform light work.

This is especially true in light of the fact that the ALJ failed to consider other diagnoses in the

medical record, specifically rheumatoid arthritis. While one consultative physician opined that Plaintiff's arthritic symptoms and pain could be the result of hepatitis C, no physician questioned the pain that Plaintiff experienced. Several other doctors, however, did diagnose rheumatoid arthritis. Indeed, physicians prescribed narcotic pain medication, then referred Plaintiff to a pain management center after she developed dependency. The undersigned fails to understand how, given Plaintiff's extensive treatment for rheumatoid arthritis, or at a minimum some sort of arthralgia, the ALJ could find rheumatoid arthritis had only a <u>de minimus</u> effect on Plaintiff's functioning.

In short, this case should be remanded to the ALJ for further development of the record and explanation of Plaintiff's limitations and their relationship to her ability to perform work-related activities. The ALJ should also reassess Plaintiff's other alleged impairments to properly determine the severity of those impairments, including rheumatoid arthritis, and the impact they have on Plaintiff's ability to function. Once the ALJ properly determines Plaintiff's RFC and supports that RFC with substantial medical evidence, the ALJ may want to contact a Vocational Expert ("VE") and pose a hypothetical reflecting that RFC. The undersigned is troubled by the medical evidence indicating that the Plaintiff experiences a tremendous amount of pain, which could impact her ability to perform the full range of work.[6] Based on the foregoing, the undersigned finds that this case should be remanded for further proceedings.

---

[6] An ALJ may rely on the Grids to find a plaintiff not disabled where the plaintiff does not have nonexertional impairments or where the nonexertional impairment does not diminish the plaintiff's RFC to perform the full range of activities listed in the Grids. <u>Muncy v. Apfel</u>, 247 F.3d 728, 735 (8th Cir. 2001) (citing <u>Holz v. Apfel</u>, 191 F.3d 945, 947 (8th Cir. 1999)). "However, when a claimant is limited by a non-exertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Grids and must instead present testimony from a vocational expert to support a determination of no disability." <u>Gray v. Apfel</u>, 192 F.3d 799, 802 (8th Cir. 1999).

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **REVERSED** and that the case be **REMANDED** for further consideration consistent with this Memorandum and Order. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  21st  day of March, 2012.